### HORNADY *et al. v.* GOODMAN *et al.*

### POUNDSTONE *et al. v.* GOODMAN; *et vice versa.*

Nos. 6690, 6691, 6692.   DECEMBER 29, 1928.

*Branch & Howard,* for Hornady et al.

*William A. Fuller, Bryan & Middlebrooks, M. H. Meeks,* and *Hamilton Douglas Jr.,* contra.

CRUM, J.   Cases numbers 6690, 6691, and 6692, relating to and involving the same subject-matter, were argued together in this court, and will be disposed of in like manner.   Number 6690 arose by petition filed by Mrs. Charles Goodman and others against Mrs. John R. Hornady and others, praying that Mrs. Hornady be enjoined from acting or attempting to act as president of the Atlanta Woman's Club, a corporation of Fulton County, Georgia, chartered, not for pecuniary gain, but for social and civic purposes; and that Mrs. Goodman be declared to be the duly elected and qualified president of such club.   Number 6691 is a proceeding in the nature of quo warranto instituted by Mrs. Odis C. Poundstone and others against Mrs. Charles Goodman, to test the title of Mrs. Goodman to the office of president of the Atlanta Woman's Club, alleging that Mrs. Goodman was not the legally elected president of such club, and that to the contrary Mrs. John R. Hornady was the legally elected president of such club, and seeking to have Mrs. Goodman ousted, and instead Mrs. Hornady declared to be elected and installed as president of the Atlanta Woman's Club.   Number 6692 is a cross-bill of exceptions involving certain rulings made by the trial judge, adverse to the contentions of the defendants in error in case number 6691.

Putting aside all questions of procedure, counsel for each of the parties in their briefs and during the argument in this court stand

upon common ground in saying that the controlling question is, who was duly elected president of the Atlanta Woman's Club at its annual meeting in May, 1928; and further, that the solution of this question depends upon a proper construction, pari materia, of the by-laws of this organization relating to the election of its officers, of its by-laws relating to how its by-laws may be altered or amended, of certain laws and resolutions or so-called "election laws" adopted in 1924, and certain "motions" that had been made and carried in relation to the election now in dispute. In view of this position of counsel, the case having been so treated by the trial judge (in the propriety of which we fully concur), taking the view of these cases which impresses us as being the correct and only legal one, we do not deem it necessary to set forth in this opinion all the allegations and contentions of the parties in detail, but will content ourselves in stating what we think to be the essential controlling facts as disclosed by the record, and the points of law raised in the pleadings.

We will take up first the quo warranto case. It strikes directly at the crux of the situation, and, if maintainable as a legal proposition, hits in a way to settle the controversy involved. This case was decided on the pleadings by the learned trial judge, he being of opinion that among these altercations there was to be found no issue of fact necessitating a trial by jury. The relator, Mrs. Poundstone and others, in due and ancient form, made known to the court that, as they contended, the Atlanta Woman's Club is a corporation, chartered, not for pecuniary gain, but as a civic and social organization, owning considerable real and personal property; that they, and several hundred other ladies, were members thereof in good standing; and that the by-laws of such club provide as follows:

"ARTICLE V. Officers.

"*Section 1.* The officers of this club shall be a President, First and Second Vice-President, Treasurer, Assistant Treasurer, Corresponding Secretary, Recording Secretary, Assistant Recording Secretary, and Auditor, who shall be separately elected by ballot by the Club. They may be re-elected but for one year. If there is only one nomination for any office, secretary shall be instructed to cast the ballot.

"*Section 2.* A Nominating Committee of five members shall be

elected at the second meeting in February. This committee shall meet as early as possible after its election, select a chairman, and proceed to arrange a ticket for presentation to the club two weeks before the day appointed for the election.

"*Section 3.* The nominee must be notified, and the consent for the use of her name obtained, before the report is made public. The ticket shall be posted in the club-house two weeks before the day appointed for the election.

"*Section 4.* As an aid to the Nominating Committee in making up the list, an informal vote will be received at the first and second meeting of the club after the election of this committee, when each member may put in a prepared box a signed list of names she would suggest for the different officers.

"*Section 5.* Nominations from the floor shall always be in order."

Petitioners further alleged and contended as follows: Mrs. Goodman is claiming to be president of the club, and the right to exercise its powers and authorities, and perform its duties. She has not been legally elected and qualified as such president, for that, at the February, 1928, meeting of the club a nominating committee of five members was elected, who reported to the April meeting a ticket to be voted on at the May meeting in the election of officers of the club. On this ticket the name of Mrs. Charles Goodman alone appeared as nominee for the office of president. At the April meeting the names of Mrs. R. L. Turman and Mrs. W. F. Melton were from the floor put in nomination for the office of president. Afterwards, and prior to the May meeting, Mrs. Melton withdrew her name as such nominee, and the name of Mrs. Turman was never withdrawn. After the withdrawal of the name of Mrs. Melton, a large number of the members of the club who were opposed to the election of Mrs. Goodman prevailed upon Mrs. John R. Hornady, who was then vice-president, to allow her name to be placed in nomination for the office of president; and it became generally known among the members of the club that Mrs. Hornady would be nominated for the office, or that an effort would be made so to do. Mrs. W. B. Price-Smith was then the president of the club, and was a strong partisan of Mrs. Goodman; and this was generally understood among the members. A large number of those who were in favor of Mrs. Hornady, and opposed to Mrs.

Goodman, had selected Mrs. Alonzo Richardson, a past president of the club, to take the lead, as representative of those favoring the nomination of Mrs. Hornady, in presenting her name from the floor at the May meeting as a nominee for the office of president. At that meeting about a hundred and fifty members were present, and when the time arrived for the election of officers, and immediately upon completion of the reading of the report of the nominating committee, Mrs. Richardson arose and addressed the chair, Mrs. Price-Smith presiding; whereupon Mrs. Moore addressed the chair, and, although Mrs. Richardson had first sought to obtain recognition from the chair, Mrs. Moore was recognized to make a motion to the effect that, as there was only one nomination for each office, the secretary should be instructed to cast the ballot. This motion was seconded. Immediately, notwithstanding Mrs. Richardson continued to ask for recognition, stating that she asked for recognition on a point of order, the motion was put, and a few votes favored it, but the vast majority of the members present voted in opposition to the motion. A division was called for, which was ignored by the chair, and the motion declared carried, and immediately Mrs. Goodman was declared to be elected president of the club, although the name of Mrs. Turman had never been withdrawn. The motion to instruct the secretary to cast the ballot was lost by an overwhelming majority of votes of the members present; but the chair arbitrarily, unreasonably, and oppressively declared the motion carried, and declared that Mrs. Goodman was elected, having ignored the call for division. An appeal from the decision of the chair was called for, and was likewise disregarded. Mrs. Price-Smith, presiding, purposely refused to recognize any one who was not favorable to Mrs. Goodman, and she purposely prevented the making of any nominations from the floor. After declaring Mrs. Goodman elected, Mrs. Price-Smith without any motion declared the meeting adjourned, and with twelve or fifteen others left the assembly hall and delivered to Mrs. Goodman the books and papers pertaining to the office of president. Thereupon (no motion to adjourn having been made) the other members continued with the meeting, and, after electing Mrs. Richardson as chairman, proceeded to the election of a president by ballot, as provided by the by-laws, with tellers regularly elected, at which election Mrs. John R. Hornady received one hundred and twenty-

three votes, and Mrs. Charles Goodman received four votes for the office of president. Mrs. Hornady is the duly and regularly elected president of the club.

The petition for leave to file this information in the nature of a quo warranto was presented to Judge John D. Humphries, of the Atlanta Circuit. The leave was granted, and an order was passed calling upon Mrs. Charles Goodman to show cause, at a time and place stated, why the prayers of the relators should not be granted.

Demurrers were filed by Mrs. Goodman, upon the grounds: (1) That the petition did not set forth a cause of action. (2) That the petition did not allege that the petitioners were either claiming the office of president or were interested therein. (3) That the petition did not allege or show that they had any actual property interest, or pecuniary interest in the office of president, or that they would suffer any loss by the defendant staying in office, or that they would gain any material advantage if the defendant were removed from office. (4) That the petition did not allege or show any civil or property right for which petitioners could claim or show any damages if the defendant continues to hold office. (5) That the petition did not allege or show that the office of president of the Atlanta Woman's Club carries any salary or emoluments which could be made the basis of a civil suit. (6) That the petition did not allege that petitioners would sustain any injury or damage if the defendant continued to hold the office of president of the Atlanta Woman's Club, but it showed that the petitioners were not claiming the office itself, or any interest therein. (7) That the petition did not allege or show that they had any kind of interest other than a remote sentimental interest in the identity of the particular person who is president of the Atlanta Woman's Club, and that such interest is that of a mere choice. The defendant filed also a special demurrer to the allegations concerning the selection of Mrs. Richardson by the members opposed to the election of Mrs. Goodman, as their representative in seeking to nominate Mrs. Hornady to the office of president at the May meeting, and to the allegations concerning the election of Mrs. Hornady as president by those members remaining in the assembly hall after the departure of Mrs. Price-Smith, upon the ground that such allegations were irrelevant and immaterial. The

defendant filed also a plea in abatement, and a motion to dismiss the quo warranto proceeding, alleging that she and others had previously filed in Fulton superior court a petition with prayers for injunction and other relief, raising, among other issues, the question of the title to the presidency of the Atlanta Woman's Club. To this plea and motion was attached as an exhibit the entire record of the case which is now before us as number 6690, in which substantially the same allegations are made as in this case.

Mrs. Goodman also filed her answer in which she averred as follows: The membership of the Atlanta Woman's Club is between seven hundred and fifty and eight hundred. The name of Mrs. Turman as nominee for the office of president was withdrawn at the same meeting it was made, such withdrawal being shown by the minutes of the April meeting, which had been read and approved at the May meeting. At the May meeting there were between two hundred and seventy-five and three hundred members present, and Mrs. Price-Smith, the president, understood that a large number of partisans of Mrs. Hornady were present for the express purpose of nominating Mrs. Hornady from the floor, and knew that such nomination could not be made legally, by reason of the fact that the same would be contrary to the election laws and by-laws. It is true that Mrs. Price-Smith declined to recognize Mrs. Richardson, whose avowed and admitted purpose was to nominate Mrs. Hornady from the floor, because such nomination would have been illegal; and if the nomination had been actually made, it would have been the duty of the president to declare it out of order. The sole purpose of Mrs. Richardson in seeking the floor at the May meeting was to place in nomination from the floor the name of Mrs. Hornady as a nominee for election as president of the club; and the act of the president, Mrs. Price-Smith, in declining to recognize Mrs. Richardson for that purpose was in strict accordance with the parliamentary procedure, election laws, and by-laws of the Atlanta Woman's Club. It is denied that there was any call for a division, as charged by the relators. Respondent is the duly elected, qualified, and installed president of the Atlanta Woman's Club, and the act of Mrs. Price-Smith in declaring her elected was legal and proper. It was the duty of Mrs. Price-Smith, as there was only one legal nomination

for the office of president, to instruct the secretary to cast the ballot for her. Nominations from the floor were not in order at the May meeting, and the ruling of the president in declining to permit such nominations to be made was legal and proper. The partisans of Mrs. Hornady at the May meeting did not exceed a hundred and twenty-five in number; they constituted a very small percentage of the total membership of the club; and the efforts of the president were directed towards preventing this relatively small minority from making an illegal nomination from the floor, and undertaking to put in office one not qualified under the election rules and by-laws of the club to be elected to the office of president.

It was further answered: The act of President Mrs. Price-Smith in adjourning the meeting as she did was occasioned by the disorder of the partisans of Mrs. Hornady, who would not permit continuation of the business next in order, which was the conducting of memorial exercises for members of the club who had died in the past year. The meeting was declared adjourned, in accordance with the provision in Fox's Parliamentary Usage, which had been adopted as the guide of the Atlanta Woman's Club, as follows: "When the prescribed hour for adjournment arrives, or when the order of exercises is completed, the president may announce that the meeting stands adjourned, or a motion to adjourn may be made and voted upon." At the April meeting the nominations had been closed. Said parlimentary guide so adopted contained a provision as follows: "The motion to close nominations, if carried, cuts off further nominations; but, as great freedom should be allowed in the election of officers, an assembly should avoid adopting this motion as long as nominations are being made in good faith." At the April meeting, the committee having reported its ticket containing the names of the proposed officers of the club, and for the office of president that of Mrs. Goodman alone, opportunity was duly given the members of the club to make nominations from the floor; and the names of Mrs. Hornady, Mrs. Melton, and Mrs. Turman were put in nomination for the office of president. Mrs. Hornady had telegraphed her refusal to permit her name to be proposed; and it was withdrawn. Mrs. Turman's name was then withdrawn; and a motion was made and carried unanimously that nominations close. The names on the ticket presented by the nominating committee, and that of Mrs. Melton,

were posted at the club-house as required by the by-laws.  On May 10, 1928, Mrs. Melton withdrew, and erased her name from the bulletin on which the same had been posted.  At the May meeting, there being but one nomination before the club for the office of president, a motion was made, in accordance with paragraph 2 of section 1 of article 5 of the by-laws, that the secretary be instructed to cast the ballot for Mrs. Goodman, the only nominee for president.  This motion was seconded, was put to a vote, and was declared carried by the president; and the secretary cast the ballot for Mrs. Goodman, and for other members on the ticket nominated (there being no contest as to the other officers), and they were declared duly elected by the president.  Mrs. Goodman and the other officers elected were called to the platform and duly installed, with the exception of three who were out of the city.

Further:  Notwithstanding the provision of section 1 of article 5 of the by-laws, that "If there is only one nomination for any office, the secretary shall be instructed to cast the ballot," and notwithstanding there was only one nomination for each office, an attempt was made by some of the supporters of Mrs. Hornady to nominate from the floor.  The presiding chairman did not and could not recognize such proceedings as regular and lawful; and thereupon the Hornady supporters created great disorder in the meeting, and were so noisy and boisterous that it was impossible for the club to proceed with the next order of business.  The president, after vainly attempting to obtain order, declared the meeting adjourned, and she and the other officers left the meeting. Respondent's election was in accordance with the by-laws and election laws of 1924, and with the course pursued under the unbroken custom of the club since its organization more than thirty years ago.  The election laws of the club, adopted in 1924, were as follows:

"RULES GOVERNING THE ELECTION OF OFFICERS.

"1.  All nominations must be posted for two weeks.  No votes will be counted except for nominee thus posted.

"2.  Only members who have paid dues for the current half-year (beginning March 15th) may vote.  No proxies may vote.

"3.  The Australian ballot shall be used.

"4.  The list of qualified voters must be closed before the balloting begins.

"5. The club must be called to order to receive a report from the treasurer, stating the exact number of qualified voters.

"6. The president shall appoint the chairman of tellers, but each candidate may name one assistant teller. These nominations must be made in writing to the president one week before the election. If less than five nominations are made, the president may appoint assistant tellers up to the number of five.

"7. The ballot-box shall be open from 12 noon to 5:30 P. M.

"8. At the close of the election the tellers shall count the votes and seal the box of ballots. All tellers must remain until the final counting of the ballots and sealing of the ballot-box.

"9. An adjourned meeting of the club will be held the following morning at ten o'clock, to receive the report of the election."

Further: The purpose of Mrs. Richardson and the other supporters of Mrs. Hornady at the May meeting was the nominating of Mrs. Hornady from the floor; the parliamentary ruling of the presiding officer, Mrs. Price-Smith, prevented the nomination of Mrs. Hornady from the floor; and this ruling was correct as a matter of parliamentary law, under the election laws, constitution, and by-laws of the Atlanta Woman's Club, and under the official book regulating the parliamentary practice of the club. In respondent's opinion, there is no material issue of fact between the parties hereto; the question which must be decided ultimately is one of law, to wit, whether or not nominations from the floor were in order at the May meeting, 1928; and any other questions of law and fact are purely incidental to this question. She prays that she be decreed to be the legally elected president of the Atlanta Woman's Club.

The defendant's demurrers, plea in abatement, and motion to dismiss were overruled, and she excepted pendente lite. Upon the coming in of the answer of the defendant, by order of the court the plaintiffs and others made replication containing, among others, the following averments: The excerpt from the book of parliamentary usage quoted in the defendant's answer, relative to adjournment, is correct, but this provision had no application to the situation existing at the time Mrs. Price-Smith attempted to declare the May meeting adjourned. No fixed hour for adjournment had arrived, and the business of the meeting had not been completed. The quoted excerpt from this book on parliamentary law,

relative to the closing of nominations, is correct; but the mandatory provision in the by-laws, that "nominations from the floor shall always be in order," could not be superseded by a mere general rule of parliamentary practice, or by the adoption of a motion to close nominations; and even if the body had adopted the motion to close nominations, it could upon proper motion rescind such action, and declare nominations in order if the occasion to do so should arise; and the presiding officer would have no right or authority to arbitrarily prevent the assembly from taking such action by refusing to recognize a member or allow the proper motion to be made. The nomination of Mrs. Turman had not been withdrawn. The facts relating thereto were, that at the April meeting, when nominations from the floor were called for, Mrs. D. R. Wilder addressed the chair, was recognized, and placed Mrs. Turman in nomination for the office of president, whereupon Mrs. Price-Smith, the presiding officer, stated that Mrs. Turman was not a member of the club, not having paid her dues; that Mrs. Wilder said nothing further, and did not withdraw the name of Mrs. Turman from nomination; that Mrs. Price-Smith of the club had no right or authority to prevent the name of a member of the club being placed in nomination for the office of president; that Mrs. Turman was a member of the club, and according to the by-laws of the club was in good standing and eligible for the office of president, the by-laws providing that "Any member four months in arrears may be dropped from membership of the club by majority vote of Executive Board present at any regular meeting, with the regular two weeks notice;" and that Mrs. Turman had not received any notice that she was in arrears of dues, and had not been dropped from the membership of the club by action of the Executive Board. Between the April and May meetings, Mrs. Melton having withdrawn her name from nomination, in this changed situation a large number of the active members of the club prevailed upon Mrs. Hornady to allow the use of her name as a nominee for the office of president; and they had the right, on proper motion, to rescind their action in declaring the nominations closed, and to have the matter of nominations reopened and have nominations received from the floor.

Further: The so-called election laws of 1924 were adopted only for the particular election then pending, and were not adopted as

general or permanent rules of the club. Section 5 of article 5 of the by-laws, providing that "nominations from the floor shall always be in order," is in direct conflict with the so-called election laws of 1924. Article 11, section 1, of the by-laws provides: "The by-laws of this club may be amended at any regular meeting by two-thirds vote of the members present, the amendment having been proposed in writing and signed by five members of the club at a previous regular club meeting, and notice of such a change having been mailed to each member of the club; provided, that before such notice is sent out, it must be authorized by a majority vote of the Executive Board." These so-called "election laws" were not adopted in this manner; they were not proposed in the manner provided in Article 11; notice was not sent out in accordance therewith; and the so-called election laws or rules do not have the effect of amending the by-laws. Even had they been adopted as permanent rules of the club, the same authority which adopted such rules could change, or modify, or revoke the same; the members of the club at a regular meeting where there was a quorum present would have the right by majority vote to change the rules, or revoke them, or modify them; and the presiding officer would have no authority to prevent them from so doing. That portion of the minutes of the April meeting, declaring that the name of Mrs. R. L. Turman had been withdrawn from nomination was incorrect; and the minutes of the May meeting do not correctly set forth what occurred thereat. At the May meeting it was the purpose of Mrs. Richardson to proceed in a legal, orderly, and parliamentary manner to bring before the meeting, by parliamentary methods and motions, the matter of allowing nominations to be made at said meeting; that this was in all respects legal; the vast majority of the members present at such meeting desired the right and opportunity to have these matters brought before the meeting and passed upon by the meeting; and Mrs. Price-Smith had no authority to prevent action by the meeting by such methods as she then attempted to pursue.

In the opinion of the presiding judge there was no controlling issue of fact which should be submitted to a jury; and, upon consideration, his judgment was duly entered that Mrs. Charles Goodman was the duly elected president of the Atlanta Woman's Club.

■ In *McCarthy* v. *McKinney*, 137 *Ga.* 292 (73 S. E. 394), the

right to hold the office of Secretary of the "Supreme Circle of Benevolence of the United States of America," a corporation, was drawn in question by an equitable petition filed by McKinney against McCarthy. This was a private corporation having for its object benevolence in the way of sick benefits and burial expenses of its members. A salary was attached to the office. McKinney, as hold-over secretary, claimed that McCarthy had been irregularly and illegally elected and installed into such office, was holding the same, and was receiving the salary attached thereto. This court held that equity would not entertain jurisdiction to test the title to an office claimed by each of two contestants, where an adequate remedy was provided by law, and that an information in the nature of quo warranto was the proper remedy to settle such title; citing and discussing *Hussey* v. *Gallagher,* 61 *Ga.* 86, a case involving the presidency of St. Patrick's Total Abstinence and Beneficial Society, of Savannah, Georgia, a benevolent association whose objects were the "promotion of temperance and the temporal and spiritual welfare of the members," it being there held that quo warranto, and not equity, was the proper remedy; also *Harris* v. *Pounds,* 64 *Ga.* 121, a contest between two sets of trustees of a camp-meeting ground, where it was held that "equity will not interfere by injunction, but will leave the parties to settle the legal title by information in the nature of quo warranto." An examination of the original records in these two cases last cited, of file in the office of the clerk of this court, fails to show that there was any salary attached to the offices therein claimed; no reference in the pleading or evidence in either case being made to salary or any emolument attached to either office. See, in this connection, authorities cited in *Stanford* v. *Lynch,* 147 *Ga.* 518 (94 S. E. 1001), where it was held that "any citizen and taxpayer of the county has such an interest in such office [that of membership in the county board of education] as would entitle him to institute a proceeding under the above section of the code [5451, providing when the writ of quo warranto lies] against one assuming to hold that office and exercising its functions, for the purpose of inquiring into and determining his legal right thereto." Citing *Davis* v. *Dawson,* 90 *Ga.* 817 (17 S. E. 110) ; see also *Churchill* v. *Walker,* 68 *Ga.* 681 (3).

"The public are interested in the question as to who should exer-

cise a public office." *Dorsey* v. *Ansley,* 72 *Ga.* 460, 462. See also *Hathcock* v. *McGuirk,* 119 *Ga.* 973 (47 S. E. 563). *Garrett* v. *Cowart,* 149 *Ga.* 557 (101 S. E. 186). If each citizen and taxpayer of any political subdivision of the State has such an interest in the question of who shall hold public office therein as will authorize the writ of quo warranto to issue at his instance, to inquire into the right of one holding a public office therein to function as such, and if, as seen in *McCarthy* v. *McKinney, Hussey* v. *Gallagher,* and *Harris* v. *Pounds,* supra, quo warranto is the remedy to test the title of one holding an office in a private corporation, whether such corporation be one organized for gain to its stockholders, or for benevolent, charitable, or religious purposes, then certainly the members of a civic and social club have a similar right to have judicial inquiry made to determine the question of whether one is legally assuming and exercising the function devolving upon the executive head of a civic and social organization, whose members are socially upon a level, that owns exceedingly valuable property, and receives large revenue from the use of certain of its property by others. For these, and perhaps other reasons that might be stated, it would seem clear that the defendant's general demurrers were properly overruled; and we so hold.

■ There was no error in overruling the special demurrers of the defendant, Mrs. Goodman. The particular allegations attacked by these special demurrers were not irrelevant or immaterial. They were a part of the history of the case.

■ The court did not err in overruling the defendant's plea in abatement and motion to dismiss the quo warranto proceeding. In the equity case Mrs. Goodman and others sought to enjoin Mrs. Hornady from interfering with Mrs. Goodman in her administration as president of the Atlanta Woman's Club. At the first opportunity Mrs. Hornady demurred to such petition upon the ground, among others, that such equitable petition was not maintainable to try by injunction the title to such office; that the petition, stripped of the garments thrown around it in an effort to give the court jurisdiction, disclosed a case, no matter from what point seen, which was nothing more or less than an effort to test the question of who was rightfully elected president of the Atlanta Woman's Club. The authorities are in accord that all dressings should be removed; and when so laid off, if it appears that

the case is one for which quo warranto is available, equity has no jurisdiction by injunction to perform its ancient and well defined functions. The writ of quo warranto is expressly excepted from the operations of the uniform procedure act of 1887. Code § 5550. As we have already seen, this demurrer should have been sustained. No question of the right of a plaintiff to pursue two separate and distinct actions at the same time for the same cause is presented here. Mrs. Hornady was the defendant in the equity case; she had timely pleaded that the court had no jurisdiction in that case. There was no more adjudication of that case than that a temporary injunction should issue against her, at the interlocutory hearing; and within the time provided by law she sued out a writ of error in which she sought a reversal of that judgment. Even had she, as a relator, sought quo warranto as against Mrs. Goodman, there would have been no inconsistency in her position. She was not a party to the quo warranto proceeding. The parties to the two cases were not all the same. The relators were not compelled to watch the equity case draw out its weary length, when they possessed the more speedy remedy of quo warranto in a case where there was no disputed issue of fact involved, necessitating a jury trial. Should issues of fact have appeared, necessitating a jury trial, quo warranto was yet the much more speedy means by which to test the title to an office the term of which was only one year. So we conclude that the learned trial judge properly overruled this dilatory plea.

■ The Atlanta Woman's Club, being a civic and social organization chartered for purely benevolent, charitable, social and civic purposes, although incidentally owning valuable properties from which revenue is obtained, is necessarily a very democratic body. Its members meet upon a level, each enjoys all the privileges, and is entitled to the same benefits, social and otherwise, afforded any other member. All members are eligible to office. When the club adopted by-laws for its government in the matter of the election of its officers, as a conclusion of the whole matter it was provided: (Article 5, section 5). "Nominations from the floor shall always be in order." This unambiguous declaration is contained in one single sentence composed of words of every-day use and clear meaning. The subject of this declaration is the matter of "nominations" for office, when and how they are "in order,"

so that the members may have an opportunity to select officers from among all nominees; the by-laws having already provided for the election of a committee to make nominations, how such committee should receive suggestions from the body of the membership of the club, and how such committee should notify the membership of its nominations, and then, evidently in order that none of these social equals might be deprived of the privilege of her name being presented to the club as a nominee for office, this plain and sweeping law of the club is enacted with all the required formality necessary for the establishment of a permanent law. In this matter of nominations from the floor no committee action is prerequisite. The presiding officer at an election of officers is given no discretion as to whether she will or will not entertain such a nomination. The mandatory word "shall" is used. When may such a nomination from the floor be made? The answer comes from the by-law, "always." These words are to be given their ordinary signification. Civil Code, § 4. They are not words of art, and are not connected with any particular trade or subject-matter. We construe this by-law to mean that while an election for office is yet on, a nomination from the floor—that is, at any time—may be made. We think this is the plain, obvious, and common-sense meaning of this by-law.

Article 11, section 1, of the by-laws of the Atlanta Woman's Club, provides: "Amendments. The by-laws of this club may be amended at any regular meeting by two-thirds vote of the members present, the amendment having been proposed in writing and signed by five members of the club at a previous regular club meeting, and notice of such change having been mailed to each member of the club; provided, that before such notice is sent out, it must be authorized by a majority vote of the Executive Board." What is the force and effect of a valid existing by-law, regularly adopted, relating to the internal management of the affairs of a private corporation, whether organized for gain or for civic and social purposes? The Messrs. Thompson, in the third edition of their most admirable work on corporations, in each case citing authority to sustain the text, say: "§ 1075. Office and purpose of by-laws. The office of a by-law is to perform the functions of an ever-present master. The function of a by-law is to prescribe the rights and duties of the members with reference to the internal government

of the corporation, the management of its affairs, and the rights and duties existing between the members inter se. § 1076. Definition. A by-law is a permanent rule of action for the government of the members of the corporation in the conduct of the corporate affairs. It may be said to be a legislative act of the corporation." As defined by one court, "A by-law is a permanent and continuing rule for the government of the corporation and its officers. 45 L. R. A. 174. A by-law is a permanent rule of action, in accordance with which the corporate affairs are to be conducted." So far as we are advised, or have been able to learn from the authorities, the foregoing is a correct statement of the binding force of a lawfully adopted by-law. Our Code, section 2216, gives to all corporations the right "to make by-laws, binding on their own members, not inconsistent with the laws of this State and of the United States." By-laws adopted under authority of this section must, of course, not be inconsistent with the charter of the corporation and the purposes for which the corporation was created, must not infringe the common or statute law of the State, must be reasonable, must not defeat or impair any vested right of its stockholders or members, and must not be contrary to public policy.

In *Harrington* v. *Workingmen's Benevolent Association, 70 Ga.* 340, the by-laws of a benevolent association provided that a member in good standing should be entitled to six dollars per week during the period of his sickness, not exceeding eight weeks; that no claim should be considered before eight days from the date of such sickness, and no benefits should be paid outside of Savannah; that sickness from drunkenness or debauchery should not entitle a member to any benefits; and that no claim for benefit will be received or acted on, except through the sick committee and furnishing a doctor's certificate. It was held, that such by-laws were not contrary to law, and a member could only avail himself of the rights to be enjoyed in the way and in the manner provided by such rule, a prerequisite to recovering benefits being the furnishing of a doctor's certificate to the sick committee; and the mere exhibition of such a certificate to a member of that committee was insufficient. In *Union Fraternal League* v. *Johnston, 124 Ga.* 902 (53 S. E. 241), it was held: "A member of a benefit society must, in applying for benefits under its by-laws, follow the procedure therein prescribed." So it must be seen that a lawful by-

law is controlling on the subject-matter covered, unless there be something to abrogate it.

■ But it is said that the club had adopted rules governing the conduct of the election of officers; and certain rules or so-called "election laws," adopted in 1924, are said to be in conflict with and to prevail over the by-law in question. It appears that in the thirty or more years of the existence of this club before the election in question, there had been but one time when there was more than one candidate for an office. This was in 1924, when the club adopted certain rules governing elections. ° These election rules are set out in extenso in the answer of Mrs. Goodman. It appears beyond dispute, from the pleadings in this case and the evidence in the equity case, that these so-called "election laws" of 1924 were presented to and adopted at the meeting of the club held on April 28, 1924. No effort was made to comply with article 11, section 1, of the by-laws, providing how the by-laws of the club may be amended, or new by-laws adopted. They were proposed as mere "rules," and were so adopted on mere "motion." "It is a general rule that societies and clubs have the right to alter, amend, or repeal their laws, or to enact others consistent with the purpose for which they are organized; provided, the change or amendment be adopted in accordance with the mode prescribed therefor." 25 R. C. L. 50. "A by-law is a permanent rule of action, in accordance with which the corporate affairs are to be conducted. A by-law differs from a resolution, in that a resolution applies to a single act of the corportion, while a by-law is a permanent and continuing rule which is to be applied on all future occasions. 9 C. J. 1112 (e), and cit. Whether any given rule of action becomes a by-law or a resolution depends upon the solemnity with which it is passed. 7 Barb. (N. Y.) 508, 540; State ex rel. Krebs v. Hoctor, 83 Neb. 690 (120 N. W. 199). The Atlanta Woman's Club may adopt a by-law only upon compliance with article 11, section 1, of the by-laws. Any regular meeting of the club may adopt a resolution or a motion immediately upon presentation, by mere viva voce majority vote of a quorum.

■ It is further contended that the nomination of Mrs. Hornady was not in order at the time of the election, for that at the previous April meeting a motion had been made and carried to "close the nominations," and that a certain book on parliamentary usage

adopted by the club provides that "a motion to close nominations, if carried, cuts off further nominations, but, as great freedom should be allowed in the election of officers, an assembly should avoid adopting this motion as long as nominations are being made in good faith." A mere motion, ore tenus we assume, certainly can be no more binding than a resolution; and neither, for the reasons just seen, can have the effect of superseding an existing by-law. Besides, the mere motion adopted at the April meeting could not bind the May meeting. The same question was dealt with in Richardson v. Union Cong. Soc., 58 N. H. 187, where the court said: "It was an enactment made by one meeting of the society to govern the proceedings of future meetings, and was inoperative beyond the pleasure of the society acting by a majority vote at any regular meeting. The power of the society, derived from its charter and the laws under which it was organized, to enact by-laws, is continuous, residing in all regular meetings of the society so long as it exists. Any meeting could, by a majority vote, modify or repeal the law of a previous meeting, and no meeting could bind a subsequent one by irrepealable acts or rules of procedure. The power to enact is a power to repeal; and a by-law, requiring a two-thirds vote of members present to alter or amend the laws of the society, may itself be altered, amended, or repealed by the same power which enacted it." See also 14 C. J. 356-358.

It is further contended that the method of nominating and electing officers pursued at the election in question was not only in accordance with the by-laws and the election laws of 1924, but was the same course which had been pursued under the unbroken custom of the club since its organization, more than thirty years ago. There had been no previous contest for office in the club, except in 1924. Certainly custom can not be established by one act only, or a certain course pursued one time only. The course pursued in 1924 is not even a precedent; for it is not shown that in 1924 any effort was made to nominate from the floor on the day of the election.

At the May meeting, 1928, the minutes of the previous April meeting were read and approved. This did not constitute a legislative act. It was a mere acknowledgment that the secretary had correctly recorded that which occurred at the April meeting.

■ Counsel for Mrs. Goodman in their brief in this case propound the query: "Is Mrs. Charles Goodman the legally elected president of the Atlanta Woman's Club?" and state that the answer to this question depends upon another question, to wit: "Did the supporters of Mrs. Hornady have the legal right, under the election rules, by-laws, and parliamentary practice rules of the club, to nominate Mrs. Hornady from the floor at the May, 1928, meeting?" and say further that it is conceded that if this question is answered affirmatively, Mrs. Goodman was not the legally elected president. We have seen that a permanent standing by-law of the club provided that "nominations from the floor shall always be in order;" that the so-called election laws and closing of nominations, while conflicting therewith, can not have the effect of diminishing its binding force; that no custom contrary to this by-law had been followed in the club; and it may be further said that "a by-law can not be repealed by non-user." Yeaton *v.* Somersworth Grange, 77 N. H. 332 (91 Atl. 868). So it must be held that Mrs. Goodman was not legally elected president of the Atlanta Woman's Club at its annual meeting in May, 1928.

■ In view of the peculiar circumstances of the election which brings about these cases, we have concluded that it is proper for this court to exercise the broad power conferred on us by the Code of 1910, § 6103, par. 2, and to direct that upon the filing of the remittitur from this court in the court below an order therein be promptly made, ousting the defendant in error, Mrs. Charles Goodman, from the presidency of the Atlanta Woman's Club, and directing that the present acting secretary of said club at once assume the presidency thereof, with all its powers, prerogatives, and duties, and that such secretary be directed to call at once an election for the office of president of said club, the same to be participated in by all members lawfully entitled so to do, to be held at the usual place of holding such elections by said club, and to be at such appropriate time in the near future as may seem reasonable, and be fixed in such order of the presiding judge of the court below, and to be conducted in conformity with the laws of said club as construed by this court, and such other temporary rules and regulations for holding and ascertaining and declaring the result of such election as may be prescribed in such order; all members of said club in good standing to have written or printed notice of the time

and place of holding said election, with written or printed signature of the officer calling such election, at least five days before the date thereof; such notice to be given by mail directed to the last known address of each member. The person lawfully elected at such election immediately after her election is declared shall be installed by the proper officer as the president of the Atlanta Woman's Club, clothed with all the powers and charged with all the duties of president of the Atlanta Woman's Club as prescribed by its•by-laws, and to hold such office until the next regular annual election of officers therein.

*Judgment in Hornady* v. *Goodman* (6690) *reversed. Judgment in Poundstone* v. *Goodman* (6691) *reversed, with direction, on the main bill of exceptions; and affirmed on the cross-bill* (6692). *The Chief Justice and Crum, Roop, and Thomas, JJ., concur. Stark and Maddox, JJ., dissent.*

STARK, J., dissenting. These cases were argued together. Counsel for each of the parties in the equity case, as well as in the quo-warranto case, and the cross-bill of the same, agree that the controlling question is, who was the duly elected president of the Atlanta Woman's Club at the annual May meeting? By-laws throwing light on the questions involved in this case are as follows:

Article 5, section 1. The officers of this club shall be a President, First and Second Vice-President, Treasurer, Assistant Treasurer, Corresponding Secretary, Recording Secretary, Assistant Recording Secretary, and Auditor, who shall be separately elected by ballot of the club. They may be re-elected but for one year. If there is only one nomination for any office, secretary shall be instructed to cast the ballot.

Section 2. A nominating committee of five members shall be elected at the second meeting in February. This committee shall meet as early as possible after its election, select a chairman, and proceed to arrange a ticket for presentation to the club two weeks before the day appointed for the election.

Section 3. The nominee must be notified, and the consent for the use of her name obtained, before the report is made public. The ticket shall be posted in the club-house two weeks before the day appointed for the election.

Section 4. As an aid to the nominating committee in making up the list, an informal vote will be received at the first and second

meeting of the club after the election of this committee, when each member may put in a prepared box a signed list of names she would suggest for the different officers.

Section 5. Nominations from the floor shall always be in order.

The writer will discuss first the quo-warranto case of *Poundstone* v. *Goodman*. The court did not err in overruling the general and special demurrers filed by the defendant, and in overruling the plea in abatement. The writ of quo warranto was the proper proceeding to raise the question, who was elected president of the Atlanta Woman's Club. *McCarthy* v. *McKinney*, 137 *Ga.* 292; *Hussey* v. *Gallagher*, 61 *Ga.* 86; *Harris* v. *Pounds*, 64 *Ga.* 121; *Stanford* v. *Lynch*, 147 *Ga.* 519; Code, § 5451. The Atlanta Woman's Club is a corporation chartered under the laws of Georgia. As such it has the right to pass such by-laws and rules for the government of its internal affairs, as well as the election of its president, as it sees fit, not inconsistent with its charter, and the laws of the State. Code, § 2216. Corporations, as well as legislative bodies, have the right to adopt rules governing their meetings or proceedings; this applies to the Atlanta Woman's Club. It appears that "Fox's Parliamentary Usage" had been regularly adopted by this club as its parliamentary guide. This guide provides: "To close nominations. The motion to close nominations, if carried, cuts off further nominations." At the April meeting the record shows that this motion was made and carried, and when the minutes (if it had been a legislative body it would have been called the Journal) of the April meeting were read at the May meeting they were confirmed; and so far as the record shows, they were confirmed without any motion being made to rescind or modify that portion of the minutes closing nominations. This was tantamount to again closing nominations.

It is insisted, however, that section 5 of the by-laws, "Nominations from the floor shall always be in order," gave to Mrs. Richardson the right at the May meeting to nominate Mrs. Hornady from the floor. Section 5 must be construed in connection with sections, 1, 2, 3, and 4 of the by-laws, and also with reference to the parliamentary guide adopted. It was evidently the intention of the Atlanta Woman's Club, in the adoption of by-law 5, providing that nominations from the floor should always be in order, to reserve to the members of the club the right to make

nominations from the floor, and not be tied by a nominating committee of five provided by the by-laws; and as long as that nominating committee of five could function, nominations from the floor were in order. But it would be giving section 5 an unreasonable construction, one that the other by-laws, rules, and parliamentary guide clearly show was not intended to be given to it, to hold otherwise. The nominating committee of five were required to present the name of a member of the club for president; but notwithstanding this power given the nominating committee, nominations from the floor were always in order. This course was pursued at the April, 1928, meeting, and then by action of the club nominations were closed. In the face of this action Mrs. Richardson was without authority to nominate Mrs. Hornady at the May meeting.

Among the definitions of the word "always" by Webster, are "Constantly during a certain period, or regularly at stated intervals;" and by giving the word "always" this construction there is no conflict between these by-laws and rules. In 1 Words and Phrases reference is made to an act requiring all railroad companies to keep engineer, fireman, or some one else "always on the lookout" ahead when the train is in motion, and to a ruling that such act does not require that the railroad company should keep somebody on the locomotive throughout the entire trip "always on the lookout," but it is sufficient if the precaution was being observed when the accident occurred. Louisville & Nashville R. Co. v. Stone, 54 Tenn. 468-471. When the club convened at the May meeting, after the nominations had been closed by its action, and when only the name of Mrs. Goodman was before the body for president, the second paragraph of section 1 of article 5 of the by-laws, that "If there is only one nomination for any office, secretary shall be instructed to cast the ballot," applied, and it was proper for the presiding officer to direct the secretary to cast the ballot for Mrs. Goodman. This paragraph says the secretary "shall" cast the ballot. The court was therefore right in holding that at the May meeting, 1928, Mrs. Price-Smith as president was within her right and authority when she directed the secretary to cast the ballot of the club for Mrs. Goodman, and that Mrs. Goodman was the duly and legally elected president of the Atlanta Woman's Club.

As to the equity case (No. 6690), the court did not err in overruling the demurrers of the defendant. There were other issues

and matters germane in the injunction proceeding besides the sole question as to who was president of the Atlanta Woman's Club. The care, control, and management of the property of the club was involved, as well as its upkeep.

MADDOX, J. I concur in the conclusion reached by Judge Stark, but do not agree to his view that the confirming of the minutes of the April meeting was tantamount to again closing the nominations. In my opinion this merely confirmed what took place at the April meeting of the club.

ROOP, J., concurs in the result, but not in all that is said in the opinion.